UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MIYOSHI COLLINS,

                Plaintiff,

     -against-                              6:17-CV-0925 (LEK/TWD)

RESOURCE CENTER FOR
INDEPENDENT LIVING,

                Defendant.

---

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

On August 22, 2017, pro se plaintiff Miyoshi Collins commenced this action against the

defendant, the Resource Center for Independent Living, alleging discrimination in violation of

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Dkt. No. 1

("Complaint"). Presently before the Court is Defendant's Rule 12(c) motion for judgment on the

pleadings, Dkt. No. 21 ("Motion"); see also Dkt. Nos. 21-16 ("Memorandum"),

26 ("Opposition"). For the reasons that follow, Defendant's Motion is granted in part.

## II.     BACKGROUND

### A.  Factual Background

The parties submitted a number of documents along with their pleadings and motions, not

all of which may be considered by the Court at this stage. See Prentice v. Apfel, 11 F. Supp. 2d

420, 424 (S.D.N.Y. 1998) ("In deciding a motion for judgment on the pleadings, a court may

consider the pleadings and exhibits attached thereto, statements or documents incorporated by

reference in the pleadings, matters subject to judicial notice, and documents submitted by the

moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." (citing <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993))). The facts in this section are therefore drawn solely from the following documents: (1) the Complaint; (2) the exhibits attached to the Complaint, Dkt. No. 1-1 ("Exhibits"); and (3) several 2016 physician notes from Adirondack Internal Medicine & Pediatrics regarding Plaintiff's ability to work, Dkt. No. 21-9 ("Physician Notes").[1] As required when "evaluating a Rule 12(c) motion, the [C]ourt [will] view the pleadings in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party." <u>Madonna v. United States</u>, 878 F.2d 62, 65 (2d Cir. 1989).

### 1. Plaintiff's Pre-2014 Employment History

Defendant, a "[c]ivil [r]ights [a]gency" and "not-for-profit-corporation whose mission is to work towards a fully accessible, integrated society," hired Plaintiff, a black woman, as a Community Advocate on January 16, 2001. Opp'n at 2; Exs. at 27, 34. She later worked "for several years" in Defendant's Medicaid Service Coordinator Department, before becoming the Director of Defendant's Waiver Department. Exs. at 27. In that role, Plaintiff "directed staff members [tasked with] go[ing] into consumer's homes to assist them with their [activities of daily living] and other goals that would keep them in their home and community independently." <u>Id.</u> at 27. She also "work[ed] with [Defendant's] CEO, CFO, and other staff members to creat[e the] At Home Independent Care" program, which she oversaw as a Senior Program Director.

---

[1] Most notably, this list excludes the affidavit—sworn to by Amy Dewan, Plaintiff's former manager—which was filed by Defendant in support of the Motion. Dkt. No. 21-6 ("Dewan Affidavit").

Id. at 10, 28, 34. As of April 2014, Plaintiff was the only black Senior Program Director

employed by Defendant. Id. at 10.

### 2. Plaintiff's Alleged Demotion and New Role

In November 2013, Defendant "underwent a management change" and hired Zvia

McCormick as its new CEO. Id. at 34. Under McCormick's leadership, Defendant conducted a

review of its operations. Id. Although McCormick "never took the time to [get to] know

[Plaintiff] or to find out what [she] was capable of doing," Compl. at 6, McCormick decided that

Plaintiff "should be moved from her position supervising the At Home program," Exs. at 10, and

that she should no longer "supervis[e] any of [Defendant's] community[-]base[d] programs,"

id. at 24. That change was announced at an April 2014 "managers meeting," which was attended

by all of Defendant's managers and directors. Id. at 10. Plaintiff had not been informed of that

decision prior to the April 2014 meeting,[2] and the announcement humiliated her in front of her

colleagues. Id. In addition, the change in responsibilities "caught [Plaintiff] off guard," because

her "evaluations never suggested [that she] was not doing [her] job" and "there was no [other]

indication that [she] was doing a bad job." Id.

It is not clear what job title Plaintiff held or what duties she performed in the months

immediately following the April 2014 meeting. However, Plaintiff was transferred "from [her]

Genesee Street office . . . to the Columbia Street site to an office that had no heat," and from

there to "another office with an administrative assistant." Id. Plaintiff "contracted a bad case of

bronchitis" as a result of those moves, and felt that Defendant was "tr[ying] to take away [her]

---

[2] McCormick later told Plaintiff that she was under the impression, prior to the April 2014 meeting, that Plaintiff's "immediate supervisor had told [Plaintiff]" about the decision. Id. However, Plaintiff asserts that no such conversation ever took place. Id.

dignity [and] sham[e her] in front of [her] co-workers" by making her the only Senior Director forced to share an office with an administrative assistant. Id. Meanwhile, "[i]ndividuals [that Plaintiff] had supervised remained in their offices. These individuals were [w]hite." Id. at 23.

Then, in December 2014, Plaintiff met with McCormick "to discuss where [she] wanted to go in the agency." Id. at 26. According to Plaintiff's account of that meeting, McCormick "spoke about a training program" operated by Defendant and asked Plaintiff "if [she] would be interested" in heading it. Id. Plaintiff indicated that she would, but understood "that there would be further discussion on the matter." Id. Before any more consultation, however, Plaintiff was promptly named as Defendant's new Director of Training. Id. Plaintiff considered the move a "demot[ion]," id., though she retained the same salary and benefits as well as her status as an "exempt-managerial" employee, id. at 33.

Plaintiff alleges that she "was the Director of Training in name only." Id. at 26. In that new role, she reported directly to Ernest Ortis, Defendant's Corporate Compliance Officer, who "bullied [her] on a daily basis" over the course of "more than six months." Id. at 12, 26, 33. However, while Plaintiff claims that Ortis "humiliated [her] in front of [her] peers," the only specific acts described in the Complaint are (1) Ortis's requirement that Plaintiff inform him "where [she] was every minute of the day[,] even if [she] went to the bathroom," id. at 12, 26; and (2) a "disrespectful email" sent to Plaintiff from Ortis during his first week as Plaintiff's supervisor, for which he later apologized, Compl. at 6. Plaintiff complained of Ortis's treatment to both Dewan and McCormick—stating on one occasion that Ortis's "harassment was beginning to make [her] physically sick"—"but nothing changed [and Ortis] continued to degrade [her]." Exs. at 12, 26. As a result of Ortis's treatment and the stress it produced, Plaintiff began to feel

depressed. Compl. at 6. She saw her doctor and, in January 2015, was prescribed anti-depression medication. Id.; Exs. at 12.

At the same time that Plaintiff's responsibilities were being reduced, Plaintiff claims that McCormick's reorganization resulted in the promotion and protection of several white employees. Exs. at 13. For example, a white employee named Margret Batson was made part of the leadership team, though she "only had been with the agency about five years." Id. And one of the white employees that Plaintiff supervised, Susan Gage, was given two "final warning[s] because of her unprofessionalism," but "remained employed." Id. Plaintiff interprets those moves as indicative of McCormick's desire to "take away everything from [Plaintiff,] such as respect, dignity[,] and [] honor." Id.

### 3. The Withheld Pay Raise

Meanwhile, Plaintiff was subject to discipline as a result of a change in Defendant's paycheck and travel reimbursement policies. Compl. at 7; Exs. at 12, 25, 33, 53. In April 2014, Defendant adopted a new policy whereby paychecks would either be sent to employees' home addresses or directly deposited into their bank accounts, rather than being available for pickup at the agency. Exs. at 12, 33, 53. Plaintiff was made aware of the new policy through a letter sent by Defendant and in a subsequent meeting with McCormick. Id. at 33, 53. Nonetheless, Plaintiff (and multiple other employees) continued to request and receive printed checks from Defendant's receptionist, in violation of the new policy. Compl. at 7; Exs. at 12, 25, 33, 53. When that behavior was uncovered, Plaintiff and the other offending employees "were given a final warning," Compl. at 7; Exs. at 12, 33, 53, and were told that their "3% raise [scheduled for] the beginning of 2015" would be delayed by six months. Compl. at 7; Exs. at 12, 25. However,

Plaintiff was told that, so long as "there were no further occurrences," she would receive the raise in June 2015. Compl. at 7; Exs. at 25.

In July 2015, after the six-month disciplinary period had expired, Plaintiff unsuccessfully approached both Ortis and McCormick about obtaining her pay raise. Exs. at 12, 26. Plaintiff was eventually informed that, according to Defendant's Employee Handbook, the final warning she received in late 2014 disqualified her from receiving the raise. Compl. at 7; Exs. at 33. However, some of the white employees also disciplined for violating Defendant's paycheck procedure "automatically" received the raise in June 2015. Compl. at 7; Exs. at 25.

### 4. Modification of Plaintiff's Position

By at least August 10, 2015, Plaintiff's position was modified to encompass both the Director of Training role and a new role as Director of WIPA (Work Incentives Planning and Assistance). Exs. at 52. That modification does not seem to have resulted in any change to Plaintiff's salary or benefits structure, and she still reported to Ortis, Defendant's Corporate Compliance Officer. Id. However, according to Defendant, Plaintiff "never qualified for the WIPA program because she failed the background check." Id. at 33. Plaintiff denies that charge, and instead claims that she "ha[d] level 5 clearance" by at least June 1, 2016. Id. at 25. Regardless, it appears on the face of the Complaint that Plaintiff never fully assumed any additional responsibilities associated with that role. Id. at 25, 33.

### 5. Plaintiff's Medical Problems, Alleged Termination, and Resignation

On September 11, 2015, Plaintiff suffered "a major heart attack." Exs. at 26. She remained "in the hospital and rehab for nearly three months." Id. at 12. Plaintiff was medically cleared to return to work on January 29, 2016, with the following restrictions: "no lifting greater

than 15 lbs, no squatting[/]kneeling, keep[] leg elevated, to be allowed frequent change of position." Physician Notes at 3. However, because of previously-scheduled medical appointments, Plaintiff was not actually able to return to work until February 1, 2016. Id. at 5; Exs. at 24, 32.

After Plaintiff returned to work, once again as Defendant's Director of Training, she detected "some uncertainty about where and what they were going to do with [her]." Id. at 11. She now reported to Dewan and supervised one additional employee, but felt that she "was a supervisor in theory only . . . [because she] really didn't have any of the supervising responsibilities or duties." Id. at 24. Plaintiff's weekly meetings with her supervised employee were never one-on-one; Dewan was always present. Id. Also, though she was the Director of Training, Plaintiff did not have the final authority to regulate Defendant's training program. Compl. at 6–7; Exs. at 11. For example, in February 2016 Plaintiff successfully coordinated with the New York State Office for People With Developmental Disabilities ("OPWDD") to qualify Defendant to conduct Medicaid Service Coordination trainings. Compl. at 6–7; Exs. at 11. Plaintiff "was very excited" by OPWDD's decision, "because [she] had worked on it for so long." Exs. at 25. However, McCormick eventually decided that instead of Plaintiff, Michelle Murphy, Defendant's Director of Service Coordination (and a white employee), would conduct that training. Compl. at 6–7; Exs. at 11.

On April 13, 2016, after six weeks back at work, Plaintiff once again took medical leave to undergo cardiac surgery. Exs. at 11, 24, 32; Physician Notes at 2. Due to complications arising from that procedure, Exs. at 24, Plaintiff was not able to return to work until April 26, 2016, Physician Notes at 2. Two days after her return, Plaintiff emailed McCormick to request

permission to attend a week-long WIPA training in Baltimore. Exs. at 48. Plaintiff alleges that "[t]he [WIPA] program wanted [her] to come to the training [] to get a better understanding of how the program ran and to better assist the individuals in the program." Id. at 25. However, McCormick denied Plaintiff's request because "[a]s a manager in the department [she did] not require the training." Id. at 48. McCormick also stated that Defendant was too "short [on] funds" to afford it. Id. at 32, 48.

Then, on May 6, 2016, Plaintiff's medical problems resurfaced. Exs. at 11, 24, 32. While trying to send a fax from Defendant's offices, Plaintiff suffered an episode and "couldn't make it to the [fax machine]." Id. at 11. Other employees offered her a chair and retrieved a walker for her to use, but the next day Plaintiff was "rushed back to the hospital with acute renal failure." Exs. at 11, 24. Plaintiff spent several days in the hospital, id. at 46, and a physician note dated May 16, 2016 indicated that she would not be able to return to work until June 1, 2016, id. at 39.

On either May 16 or May 18, 2016, compare id. at 23 with id. at 32, Plaintiff placed a call to Defendant's Human Resources Department from her doctor's office. Plaintiff states that the purpose of the call was solely to discuss "paperwork for the Hartford Insurance Company and Colonial Insurance," and claims that she "called from the doctor's office because [she] wanted to make sure [Human Resources] had the correct fax number." Id. at 23. Defendant's representatives, on the other hand, interpreted the call as an indication that Plaintiff "would not be able to return to work." Id. at 32, 37. As a result, Dewan sent Plaintiff a series of text messages on May 18 and May 19, 2016, to discuss the retrieval of her personal belongings from Defendant's offices as well as the paperwork required for Plaintiff to complete the resignation

process. Id. at 35–37. Plaintiff "thought [Defendant's messages] w[ere] odd," but was unable to reach Dewan over the phone to clarify her intentions.[3] Id. at 23.

On May 20, 2016, Defendant's representatives sent Plaintiff two letters purporting to confirm and accept her resignation, and discussing the termination of Plaintiff's employment benefits. Id. at 31, 38, 40. Plaintiff claims that those letters "disrespected [and] humiliated" her, and "made [her] feel like [she] was less than a human being." Id. at 13. In response, Plaintiff sent a text message to Dewan on May 23, 2016 "indicating [she] had not resigned." id. at 23, 43. The next day, Dewan sent Plaintiff a letter indicating that "[Plaintiff] ha[d] not been terminated," and that "[i]t was [Defendant's] understanding that [Plaintiff had] resign[ed] based on numerous communications from [her]." Id. at 43. Dewan also asked Plaintiff to get in touch, so the two could discuss Plaintiff's employment status and clarify "what was meant by [Plaintiff's] previous statements concerning [her] employment with [Defendant]." Id. In a letter dated May 27, 2016, Plaintiff replied that she "did not resign" and that she "believe[d] that [she was] an active employee with the intention of returning to work on or after June 1, 2016, per [her] doctor's orders." Id. at 44–45. Dewan replied through text message that she expected Plaintiff to return to work on June 1. Id. at 23.

As a result of those events, Plaintiff's health insurance was discontinued as of May 20, 2016. Id. at 23. After receiving a hospital bill for $15,000, Plaintiff raised the issue with Defendant's Human Resources Department and her coverage was reactivated. Id. It is not clear,

---

[3] The record indicates that sometime in early May 2016, Plaintiff's daughter, Danielle Collins, may have told Defendant's Human Resources Department that Plaintiff would be unable to return to work. Id. at 32, 46. However, Plaintiff alleges that, even if such a conversation occurred, her daughter "d[id] not have the authority to speak on [her] behalf." Compl. at 7; Exs. at 46.

based on the allegations in the Complaint, whether that reactivation retroactively covered the bill

Plaintiff received, or whether she was required to pay for it out-of-pocket.

On June 1, 2016, Plaintiff returned to Defendant's offices "with the intention of returning

to work." Compl. at 7; Exs. at 23, 31. "[H]owever, [she] did not feel right about returning

because of all the terrible things that had occurred." Compl. at 7. In addition, Plaintiff alleges that

she "was scared to return to work" and had been "humiliated in front of [her] peers." Id. She

therefore met briefly with Dewan and formally tendered her resignation, as memorialized in a

handwritten note signed by both Plaintiff and Dewan. Exs. at 49.

### B. Procedural Background

Plaintiff filed her charge of discrimination with the EEOC on August 8, 2016, claiming

that she had been discriminated against on the basis of her race and disability in violation of

Title VII. Exs. at 1. On May 22, 2017, the EEOC dismissed Plaintiff's charge—finding that it

was "unable to conclude that the information obtained establishes violations of the

statutes"—and notified Plaintiff of her right to sue in federal court. Exs. at 20.

Ninety-two days later, on August 22, 2017, Plaintiff filed her Complaint. The Honorable

Thérèse Dancks, U.S. Magistrate Judge, conducted a preliminary review of the Complaint

pursuant to 28 U.S.C. § 1915(e), and found that it sufficiently stated a claim to merit a formal

response from Defendant. Dkt. No. 5 ("September 2017 Order"). Specifically, Judge Dancks

determined that the Complaint, by alleging that Defendant "demot[ed Plaintiff] from her

management position in the fall of 2014, the[n] bull[ied] her in her new position[ before]

wrongfully terminating her employment on May 20, 2016, on account of her race," set out

Title VII claims for employment discrimination and wrongful termination that survived initial

review. Id. at 1–2. The Court now finds that, when construed liberally, see Haines v. Kerner, 404

U.S. 519, 520 (1972) (a pro se litigant's complaint is to be held "to less stringent stnadards than

formal pleadings drafted by lawyers"), the Complaint also asserts the following additional

claims: (1) a Title VII claim for a hostile work environment; (2) a Title VII claim for wage

discrimination; (3) a claim for disability discrimination pursuant to Title I of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, see Exs. at 13; and (4) a state law

defamation claim, see Compl. at 8.[4] Plaintiff requests compensatory damages totaling $10

million, plus any wages withheld as a result of Defendant's July 2016 denial of Plaintiff's 3%

pay raise. Id. at 13.

Following the September 2017 Order, Defendant timely submitted an answer to

Plaintiff's allegations, Dkt. No. 16 ("Answer"), then filed the pending Motion for Rule 12(c)

judgment on the pleadings.

## III.    LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure allows a party to "move for judgment

on the pleadings." Fed. R. Civ. P. 12(c). Granting such a motion "is appropriate where material

facts are undisputed and where a judgment on the merits is possible merely by considering the

contents of the pleadings." Sellers v. M.C. Floor Crafters Inc., 842 F.2d 639, 642 (2d Cir. 1988).

"The standard for addressing a Rule 12(c) motion . . . is the same as that for a Rule 12(b)(6)

---

[4]  For the same reasons set forth in the September 2017 Order, the Court finds that
Plaintiff's hostile work environment and wage discrimination Title VII claims survive § 1915(e)
review. As a result, those claims will be analyzed with reference to Defendant's Motion, since
many of the arguments Defendant raises are pertinent to all Title VII claims and therefore apply
with equal weight to Plaintiff's hostile work environment and wage discrimination allegations.
Plaintiff's ADA and defamation claims, on the other hand, cannot survive § 1915(e) review for
the reasons detailed below, and will therefore be dismissed.

motion to dismiss for failure to state a claim." <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 521 (2d Cir. 2006). Thus, a complaint should be dismissed if it fails to "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). On the other hand, if a complaint's factual allegations "raise a right to relief above the speculative level," it should not be dismissed. <u>Twombly</u>, 550 U.S. at 544. Therefore, "[t]he granting of a motion for judgment on the pleadings is appropriate only if, with all reasonable inferences drawn in favor of the non-moving party, the non-moving party has failed to allege facts that would give rise to a plausible claim or defense." <u>Prowley v. Hemar Ins. Corp. of Am.</u>, No. 05-CV-981, 2010 WL 1848222, at *3 (S.D.N.Y. May 7, 2010).

## IV.  DISCUSSION

In its Motion, Defendant argues that Plaintiff's Complaint should be dismissed, first, because her claims are untimely, Mem. at 4–6, and second, because her allegations do not satisfy the elements of discrimination as required under Title VII, Mem. at 6–13.

### A.  Timeliness

Defendant argues that Plaintiff's Complaint is untimely for two reasons. First, Defendant claims that the Complaint violates Title VII's ninety-day filing requirement, because it was not filed until August 22, 2017, which is "ninety-two . . . days after May 22, 2017," the date on which the EEOC mailed Plaintiff notice of her right to sue. Mem. at 4–5; <u>see also</u> Exs. at 20. And second, Defendant contends that the factual circumstances giving rise to many of Plaintiff's claims fall outside Title VII's 300-day statute of limitations, meaning those claims must be dismissed. Mem. at 5–6.

### 1. Ninety-Day EEOC Deadline

Defendant's Motion misstates Title VII's ninety-day requirement. Defendant states that "[a] plaintiff seeking to pursue a federal employment discrimination suit under Title VII must file her Complaint within ninety (90) days of the Dismissal and Notice of Right to Sue letter." Mem. at 5. However, the Second Circuit has made clear that, "[i]n order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's *receipt* of a right-to-sue letter." Sherlock v. Montefiore Med. Ctr., 84 F.3d 522, 525 (2d Cir. 1996) (citing § 2000e-5(f)(1)) (emphasis added). And because it is "[n]ormally . . . assumed that a mailed document is received three days after its mailing," id. (citing Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 148 n.1 (1984) (per curiam), Plaintiff's ninety days did not begin until May 25, 2017 and, as a result, did not expire until August 23, 2017, the day after Plaintiff filed the Complaint.

Therefore, the Court rejects Defendant's argument that Plaintiff's Complaint was untimely as falling outside § 2000e-5(f)(1)'s ninety-day deadline, and will not dismiss Plaintiff's Title VII claims for that reason.

### 2. Statute of Limitations

"An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." Petrosino v. Bell Atl., 385 F.3d 210, 219 (2d Cir. 2004) (citations omitted). Plaintiff filed her discrimination charge with the EEOC on August 8, 2016, Exs. at 1; thus, the limitations period in her case began 300 days earlier, on October 12, 2015.

However, Defendant is not entirely correct that "*only* acts of discrimination that occurred after October 12, 2015 are actionable in this case." Mem. at 5. "When . . . a plaintiff's allegations

of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." Petrosino, 385 F.3d at 220. For example:

> In the case of a hostile work environment claim, the statute of limitations requires that only one . . . harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown a court and jury may consider the entire time period of the hostile environment in determining liability. . . . Other Title VII claims, such as those for termination . . . , are based on discrete acts, each giving rise to a separate cause of action. The law is clear that termination . . . claims may not be based on discrete acts falling outside the limitations period.

Id. (internal quotation marks and citations omitted); see also Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 621 (2007) ("Because a pay-setting decision is a 'discrete act,' it follows that the period for filing an EEOC charge begins when the act occurs."), superseded by statute on other grounds, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2.

Much like in Petrosino, Plaintiff's Complaint alleges discriminatory actions falling both before and after the October 12, 2015 limitations cutoff. Therefore, the Court cannot, as Defendant suggests, dismiss wholesale all of Plaintiff's Title VII claims as untimely. Instead, the Court will fold its limitations analysis into its discussion of the merits of each of those claims.

**B.  Employment Discrimination**

Title VII prohibits "discriminat[ion] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). "To establish a *prima facie* case of race discrimination, a plaintiff must prove that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the

adverse action occurred under circumstances giving rise to an inference of discrimination."

Benedith, 38 F. Supp. 3d at 317 (citations omitted).

Title VII employment discrimination claims are ultimately analyzed pursuant to the

McDonnell Douglas burden-shifting framework, 411 U.S. 792 (1973), which operates as follows:

First, a plaintiff must make a prima facie showing of discrimination. The burden then shifts to the

defendant "to articulate a legitimate, non-discriminatory reason for [its] actions." Amaya v.

Ballyshear LLC, 295 F. Supp. 3d 204, 220 (E.D.N.Y. 2018). If the defendant does so, the burden

shifts back to the plaintiff to prove that defendant's alleged reasoning was pretextual, or to in

some other way show that discrimination was the true basis for the defendant's actions. Graham

v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).

To survive a motion to dismiss, however, the plaintiff need only plead facts that

"plausibly support" the four elements in the initial McDonnell Douglas showing, including a

reasonable expectation that discovery will reveal the "minimal" evidence of discriminatory intent

required to make that showing. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d

Cir. 2015); see also Doe v. Columbia Univ., 831 F.3d 46, 55 (2d Cir. 2016) (clarifying that, as to

the final criteria, "at the [Rule] 12[] stage of a Title VII suit, allegation of facts supporting a

_minimal_ plausible inference of discriminatory intent suffices" (emphasis added)). That said, it

remains the case that "a complaint consisting of nothing more than naked assertions, and setting

forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a

claim under Rule 12[(c)]." Martin v. N.Y.S. Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d

Cir. 1978).

Defendant argues that Plaintiff's Complaint fails to state an adverse employment action, particularly within the 300-day statute of limitations. Mem. at 7–10. In addition, Defendant contends that none of the allegations in the Complaint upon which Plaintiff can now rely "could support an[y] inference of discrimination whatsoever." Mem. at 12–13.

### 1. Adverse Employment Action

"The third prong—an adverse employment action—requires [a] plaintiff to show that he or she was subject to a 'materially adverse change' in the terms and conditions of employment." Little v. Nat'l Broad. Co., Inc., 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002) (quoting Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). The Second Circuit has found that a wide variety of events could prove "sufficiently disadvantageous [so as] to constitute an adverse employment action," Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004), including "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation," Galabya, 202 F.3d at 640. However, "there is no exhaustive list of what constitutes an adverse employment action," Little, 210 F. Supp. 2d at 377, and courts have also held, for example, that the denial of training that may lead to promotional opportunities could constitute an adverse employment action, see, e.g., Ewing v. Coca Cola Bottling Co. of N.Y., Inc., No. 00-CV-7020, 2001 WL 767070, at *5–6 (S.D.N.Y. June 25, 2001) ("The Court rejects defendants' suggestion [in their motion to dismiss] that no inference of discrimination arises from" the allegation that defendants "assigned [black employees] to work exclusively in menial, disgusting, and potentially dangerous manual production jobs while similarly situated, but less senior, white employees . . . received the training for [] more desirable machine jobs").

16

The Court now finds that two of the events described in the Complaint that fall within the 300-day statute of limitations plausibly qualify, at least at this stage of the litigation, as adverse employment actions. First, a liberal reading of the Compliant indicates that McCormick's April 28, 2016 denial of Plaintiff's request to attend the WIPA training plausibly effected a "materially adverse change" in her employment prospects. Although Defendant named Plaintiff as its Director of WIPA in August 2015, Plaintiff was prevented from assuming the responsibilities associated with that role, at least in part, due to her lack of relevant qualifications. Exs. at 25, 33. Therefore, it is plausible that, by denying Plaintiff the opportunity to attend a WIPA training which would have improved her qualifications for the Director of WIPA role, Defendant "material[ly] harm[ed]" her in a manner that resulted in a "loss of career advancement opportunities." Trachtenberg v. Dep't of Educ. of N.Y.C., 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013); see also Ewing, 2001 WL 767070, at *5–6.

Second, when construed liberally, the Complaint indicates that McCormick's early 2016 decision to assign the OPWDD training to Murphy, rather than Plaintiff, both prevented her from exercising her responsibilities as Director of Training and precluded her from gaining valuable experience. Admittedly, the Complaint provides few details about the nature of Plaintiff's role as Director of Training and/or the importance of the OPWDD training both to her position and to her professional development. However, it stands to reason that, as Defendant's Director of Training, Plaintiff should have been able to control, or at the very least influence, its training-related decisions. See Exs. at 25 ("I was the Director of Training and certainly qualified to do the training [so] why shouldn't I do the training?"). In addition, the Complaint indicates that Plaintiff had, for a long period of time, "worked hard to bring [the OPWDD] training"

project to Defendant, Compl. at 6, 25, implying that the tasks associated with the training—including the administration of the training itself—may have represented a significant subset of Plaintiff's job responsibilities. Therefore, McCormick's decision could plausibly be read as undermining Plaintiff's professional authority in a manner that "significantly diminished [her] material responsibilities," Galabya, 202 F.3d at 640, thereby constituting an adverse employment action.

Accordingly, the Court finds that Plaintiff has shown two adverse employment actions within the limitations period.

### 2. Inference of Discrimination

As indicated above, "'the evidence necessary to satisfy th[e] initial burden' of establishing that an adverse employment action occurred under circumstances giving rise to an inference of discrimination is 'minimal.'" Littlejohn v. City of New York, 795 F.3d 297, 313 (2d Cir. 2015) (quoting Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001)). The Second Circuit has made clear that such a minimal plausible inference of discrimination

> can arise from circumstances including, but not limited to, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."

Id. at 312–13 (quoting Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009)). In addition, "an inference of discrimination . . . arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class . . . including at the

pleading stage." Id.; see also Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000)

("[A] plaintiff has demonstrated an inference of age discrimination and thus established a *prima*

*facie* case . . . where the majority of plaintiff's responsibilities were transferred to a younger co-

worker."); de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d

Cir. 1996) ("As a Puerto Rican, de la Cruz is a member of a protected class. Because de la Cruz

was replaced by a black female, he also satisfies the fourth prong of the *prima facie* case."). That

logic also holds true when the alleged adverse employment action consisted of a denial of

training opportunities. Ewing, 2001 WL 767070, at *5 (declining to dismiss plaintiffs' disparate

treatment claims founded on the allegation that they, as black employees, were denied training

opportunities that were required for advancement and were provided to similarly situated white

employees).

However, "a plaintiff attempting to 'show[] that the employer treated [her] less favorably

than a similarly situated employee outside [her] protected group . . . must show she was similarly

situated in all material respects to the individuals with whom she seeks to compare herself.'"

Littlejohn, 795 F.3d at 312 (citing Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir.

2003)). Such a showing "requires a reasonably close resemblance of the facts and circumstances

of [the] plaintiff's and [the] comparator's cases, rather than a showing that both cases are

identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (citation omitted). But

"[o]rdinarily, the question whether two employees are similarly situated is a question of fact for

the jury." Mandell, 316 F.3d at 379.

After citing to three cases that provide examples of situations when an inference of

discrimination *could* arise, Defendant summarily states that, "[i]n [Plaintiff's] case, no

allegations are made that could support an inference of discrimination whatsoever, and certainly none are alleged at all during the three hundred (300) day limitations period." Mem. at 12–13. The Court disagrees. True, the denied WIPA training cannot on its own support such an inference, as Plaintiff has failed to point to any similarly situated employees that were granted the opportunity to attend that training (or another like it). However, the Court finds that several of the other allegations contained in the Complaint—including (1) Plaintiff's alleged demotion, which coincided with the promotion and/or retention of other, less qualified white employees; (2) the post-discipline pay raise that was automatically granted to certain white employees, but denied Plaintiff; and (3) McCormick's decision to assign all of the OPWDD training responsibilities to Murphy, a white employee, rather than Plaintiff, a black employee—satisfy Plaintiff's minimal burden at this stage of the litigation. See Petrosino, 385 F.3d at 220 (affirming the district court's consideration of all of the plaintiff's allegations regarding "allegedly gender-hostile actions" in her workplace—including those that occurred before the cutoff imposed by the statute of limitations—because plaintiff's inclusion of allegations within the limitations period rendered her non-discrete Title VII claim timely).

It is not necessarily clear to the Court, based solely on the allegations contained in the Complaint, that Plaintiff was similarly situated to each of the comparators in the above three cases. However, in describing the post-discipline pay raise, Plaintiff states that both she and the white employee comparators were disciplined for the same offense, and presumably should have received the same treatment. Moreover, regarding the OPWDD training, both Murphy and Plaintiff held "Director" level positions within Defendant's agency, and as the Directors of Service Coordination and Training, respectively, it seems plausible that either of the two would

have been qualified to conduct the OPWDD training program. And regardless, Defendant has failed to raise any arguments calling those aspects of Plaintiff's claims into question. Therefore, the Court finds that the Complaint sufficiently pleads that Plaintiff was similarly situated to each of the above comparators to satisfy Plaintiff's minimal burden at this stage.

Therefore, the Court denies Defendant's Motion as to Plaintiff's Title VII employment discrimination claim.

### C. Wrongful Termination

Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." § 2000e-2(a)(1). The analysis applicable to Title VII wrongful termination claims is nearly identical to that used for employment discrimination claims, namely: a plaintiff must make a prima facie showing: "(1) that she was a member of a protected class; (2) that she was qualified for the position; (3) that she was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination." Meng v. Ipanema Shoe Corp., 73 F. Supp. 2d 392, 397 (S.D.N.Y. 1999) (citing Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994)).

Defendant's Motion challenges Plaintiff's wrongful termination claim on three grounds. First, Defendant asserts that Plaintiff's claim falls outside the statute of limitations. Second, Defendant argues that "[Plaintiff] simply cannot show [that] any adverse employment action"

occurred. Mem. at 8. And third, Defendant contends that "no allegations are made that could support an[y] inference of discrimination whatsoever."[5] Id. at 13.

### 1. Statute of Limitations

A plaintiff's Title VII claim for wrongful termination is based on "discrete acts," Petrosino, 385 F.3d at 220, which "accrue upon notice of termination" and which must have occurred within the 300-day period in order to satisfy the relevant statute of limitations, Amaya, 295 F. Supp. 3d at 219. According to the Complaint, Plaintiff's alleged wrongful termination occurred on either May 20 or June 1, 2016. Exs. at 13, 23, 38, 40. On May 20, 2016, Defendant's representatives sent Plaintiff two letters purporting to confirm and accept Plaintiff's resignation, and stating that Plaintiff's "benefits with [Defendant] will end on May 20, 2016." Id. at 38. Then, on June 1, 2016, Plaintiff resigned under circumstances that she alleges constituted constructive termination. Compl. at 7. Those events occurred after October 2015, and therefore fall inside of Title VII's 300-day statute of limitations.

### 2. Adverse Employment Action

#### a. May 20, 2016—Alleged Termination

It is well settled that the termination of an employee constitutes an adverse employment action, as termination will by definition eliminate all of the "tangible job benefits" associated with employment. Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002); see also Williams, 368 F.3d at 128 ("Employment actions that have been deemed sufficiently disadvantageous to

---

[5] Because the Court agrees that Plaintiff's Complaint fails to plausibly plead an adverse employment action, it will not reach Defendant's third argument.

constitute an adverse employment action include 'a termination of employment.'" (quoting

<u>Galabya</u>, 202 F.3d at 640)).

However, while the circumstances surrounding Plaintiff's alleged May 20, 2016 termination are far from clear, it does not appear based on the facts alleged that any termination actually occurred, even when all reasonable inferences are drawn for Plaintiff. Although the letters sent to Plaintiff on that date indicated that "[her] employment with [Defendant] is ending today, Friday, May 20, 2016," and explained that her benefits would be immediately discontinued, Exs. at 40–41, Plaintiff admits that Defendant later rescinded those letters and reinstated her benefits, <u>id.</u> at 23. Moreover, Plaintiff's Complaint makes clear that she returned to Defendant's offices on June 1, 2016—the date her physician indicated she would be able to resume work, Exs. at 43—with the intention of reclaiming her position. Compl. at 7. Most importantly, the only penalty (financial or otherwise) that Plaintiff seems to have suffered as a result of the May 20, 2016 letters was the $15,000 medical bill she received following the termination of her benefits. Exs. at 23. But Plaintiff also states that her insurance benefits were later reactivated, and does not claim that she was actually required to pay that bill.

The Court therefore finds that, as currently pled, the Complaint fails to state a Title VII claim as related to Plaintiff's alleged wrongful termination on May 20, 2016, because it does not allege that that event resulted in the loss of any tangible job benefits. That claim will therefore be dismissed without prejudice. However, if Plaintiff can point to a tangible job benefit that was

eliminated as a result of the actions undertaken by Defendant on May 20, 2016, she may amend

her Complaint to restate her claim.[6]

### b. June 1, 2016—Constructive Termination

"[A]n employee is constructively discharged when [her] employer, rather than

discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is

forced to quit involuntarily."[7] Petrosino, 385 F.3d at 229. "To find that an employee's resignation

amounted to a constructive discharge, 'the trier of fact must be satisfied that the . . . working

conditions would have been so difficult or unpleasant that a reasonable person in the employee's

shoes would have felt compelled to resign.'" Whidbee, 223 F.3d at 73 (quoting Lopez v. S.B.

Thomas, 831 F.2d 1184, 1188 (2d Cir. 1987)). "This standard is higher than the standard for

establishing a hostile work environment," Fincher v. Depository Trust & Clearing Corp., 604

F.3d 712, 725 (2d Cir. 2010), and caselaw from the Second Circuit has set a relatively stringent

standard for what constitutes an "intolerable" work environment, see, e.g., Petrosino, 385 F.3d at

230 (dismissing a plaintiff's constructive termination claim despite allegations that her employer

fostered a work environment that was overtly hostile to women and forced her into a dead-end

---

[6] Plaintiff is instructed that any amended complaint she files must bear her original
signature, and must be a complete pleading which will supersede and replace the original
Complaint in its entirety.

[7] Although recent Supreme Court caselaw has suggested that constructive discharge
claims do not require proof that the employer intended to force the employee to resign, see, e.g.,
Pa. State Police v. Suders, 542 U.S. 129, 148 (2004); Green v. Brennan, 136 S.Ct. 1769, 1774–75
(2016), the Second Circuit has not yet decided whether a showing of intent is still required when
considering such claims, see Nugent v. St. Lukes–Roosevelt Hosp. Ctr., 303 F. App'x 943, 945
(2d Cir. 2008) (declining to decide the effect of Suders, because the plaintiff "introduced
insufficient evidence to survive summary judgment" under either standard). Without clear
guidance to the contrary, the Court will continue to apply the higher intent-based standard.

position with no opportunity for advancement); <u>Kenney v. New York</u>, No. 16-CV-4522, 2017 WL 5633166, at *8–9 (S.D.N.Y. Nov. 20, 2017) (dismissal warranted despite plaintiff's allegations that her employer allowed her sexually-harassing supervisor to return to work and asked whether, as a result, plaintiff planned to quit).

The Complaint alleges that, by June 1, 2016, Plaintiff's work atmosphere had become intolerable in the sense required under Title VII "because of all the terrible things that had occurred," because she "was scared to return to work," and because she had been "humiliated in front of [her] peers." Compl. at 7. The Court disagrees. It is not plausible that a reasonable person in Plaintiff's position would have felt compelled, as a result of the working conditions allegedly imposed by Defendant, to resign. Despite the changes in her professional responsibilities and environment that occurred between April 2014 and June 2016, Plaintiff was paid the same salary and benefits throughout that period and retained her status as an exempt-managerial employee. <u>See</u> <u>Cahill v. O'Donnell</u>, 75 F. Supp. 2d 264, 278 (S.D.N.Y. 1999) (granting summary judgment against plaintiff-investigator's constructive termination claim founded on his retirement after being removed as head of an investigation and reassigned to a newly-created administrative position which "entailed the same salary and benefits"). And in any event, Plaintiff's allegations in no way suggest "that [Defendant] deliberately created intolerable working conditions in order to force h[er] resignation." <u>Cahill</u>, 75 F. Supp. 2d at 278.

### 3. Conclusion

Accordingly, the Court grants Defendant's Motion as to Plaintiff's wrongful termination claim, which will be dismissed without prejudice. Plaintiff may attempt to replead her claim

under either a formal termination or constructive termination theory, if she can supplement her Complaint with factual allegations sufficient to satisfy the standards set forth above.

### D. Hostile Work Environment

A Title VII violation also occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations marks and citation omitted). In order to prevail on a hostile work environment claim, a plaintiff must plead "'(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" Petrosino, 385 F.3d at 221 (quoting Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)).[8] The first element consists of both an objective and subjective component, such that "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks omitted).

In evaluating the severity and pervasiveness of alleged discriminatory behavior, "[t]he Supreme Court [has] established a non-exclusive list of factors to consider . . . : (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening

---

[8] Although Petrosino dealt with hostile work environment claims premised on sexual harassment, "the same standards apply to both race-based and sex-based hostile environment claims." Richardson v. N.Y.S. Dep't of Corr. Serv., 180 F.3d 426, 436 n.2 (2d Cir. 1999) (citations omitted), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

or humiliating . . . ; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 82 (2d Cir. 2009) (internal quotation marks and citations omitted). Such a determination "depends on the totality of the circumstances," Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), but, "[o]rdinarily, a race-based hostile work environment claim must involve 'more than a few isolated incidents of racial enmity,'" La Grande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 210 (2d Cir. 2010) (quoting Williams v. County of Westchester, 171 F.3d 98, 100–01 (2d Cir. 1999) (per curiam)). Nonetheless, "[t]he fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious of cases." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 (2d Cir. 2000).

With those standards in mind, the Second Circuit has found race-based hostile work environments to exist when, for example, a supervisor has used racial slurs and/or "an unambiguously racial epithet . . . in the presence of his subordinates," Cruz v. Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) (quoting Rodgers v. Western–Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)); see also Aulicino, 580 F.3d at 83–85, or when an employee has been physically threatened as a result of their race, Whidbee, 223 F.3d at 71. On the other hand, the Second Circuit in Williams declined to overturn a jury verdict finding that no race-based hostile work environment existed, despite evidence that (1) both the plaintiff and other minority employees "did not have a good feeling about [their] work environment" because "an atmosphere of uneasiness existed;" (2) the plaintiff found a file containing racist material in the office; and (3) the plaintiff was given "menial tasks" to perform. 171 F.3d at 101–02. In so doing, the

<u>Williams</u> court held that the evidence presented "fell well short of the proof required to show a hostile work environment." <u>Id.</u> at 101.

Defendant argues in its Memorandum that, because the vast majority of Plaintiff's allegations "concern matters well outside the 300-day statute of limitations," "nothing in the Complaint [falling within the statute of limitations] . . . could be construed as harassment *based on race*, and certainly nothing that could constitute [sic] 'severe and pervasive' harassment based on race." Mem. at 10. But as the Court has already indicated, "the statute of limitations requires that only one . . . harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown a court and jury may consider the entire time period of the hostile environment in determining liability." <u>Petrosino</u>, 385 F.3d at 220. Therefore, the Court is free to consider events that occurred prior to the October 2015 limitations cutoff, so long as there is at least one post-October 2015 event indicative of a hostile work environment.

However, the Court finds that Plaintiff's Complaint, even when examined through such a broad lens, fails to state a hostile work environment claim capable of surviving Defendant's Motion. The factual allegations that could be construed as supporting her claim include: (1) the April 2014 change in her responsibilities and work conditions, which coincided with the promotion and/or retention of certain white employees; (2) Ortis's requirement that Plaintiff inform him of her whereabouts at all times; (3) McCormick's post-October 2015 decision to assign the OPWDD training to Murphy, rather than Plaintiff; and (4) McCormick's post-October 2015 decision denying Plaintiff the opportunity to attend the Baltimore WIPA training. Those events—even when considered as a whole—fall well short of the "severe or pervasive" standard required for showing the existence of "an objectively hostile or abusive work environment."

Terry, 336 F.3d at 148. Plaintiff does not claim that any racially derogatory statements were made either to her or any other of Defendant's employees, and the allegations in the Complaint "contain no suggestion of hostility or offensiveness" based on race. Parekh v. Swissport Cargo Servs., Inc., No. 08-CV-1994, 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009) (dismissing a plaintiff's hostile work environment claim because his "complaints concerning unfair disciplinary actions, shift changes, reduction in manpower, wrongfully withheld vacation time, failure to provide him with proper equipment, workplace transfers, failure to promote, and his termination contain no suggestion of hostility or offensiveness"); see also Benedith v. Malverne Union Free Sch. Dist., 38 F. Supp. 3d 286, 323–24 (E.D.N.Y. 2014) (finding that a plaintiff's race-based hostile work environment claim, based on his allegations of "(1) unfair performance evaluations; (2) unwarranted wage disparities; and (3) disparate administrative assignments, all on the basis of race," were insufficient to survive his employer's motion for summary judgment).

Accordingly, the Court finds that Plaintiff's Complaint fails to plausibly state a hostile work environment claim capable of surviving Defendant's Motion for judgment on the pleadings. That claim will therefore be dismissed without prejudice.

### E. Wage Discrimination

Much like her wrongful termination claim, Plaintiff's wage discrimination claim is based on "discrete acts" which must have occurred within Title VII's 300-day limitations period. Unlike Plaintiff's wrongful termination claim, however, the events giving rise to Defendant's alleged wage discrimination did occur outside the limitations period. In the Complaint, Plaintiff accepts that she was not eligible until June 2015 for the three percent raise originally scheduled for January 2015. She therefore challenges only Defendant's July 2015 decision—apparently

implemented by Ortis and/or McCormick—to deny Plaintiff the raise following the expiration of her six-month disciplinary period. But Plaintiff does not claim that Defendant made any post-October 2015 decisions regarding her pay structure, or that she was denied any other raises during her remaining time employed by Defendant.

Therefore, Plaintiff's wage discrimination claim is barred by the statute of limitations and will be dismissed with prejudice.

**F. Plaintiff's Remaining Claims**

Understandably, given the initial review conducted in the September 2017 Order, Defendant's Motion addresses only Plaintiff's Title VII claims. However, § 1915(e) directs a court, when a plaintiff seeks to proceed IFP, to "dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." § 1915(e)(2)(B). An action is frivolous if the complaint "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989).

The Court will therefore review Plaintiff's remaining two claims—for disability discrimination under the ADA and for defamation under New York state law—to determine whether they are capable of surviving § 1915(e) review.

*1. The ADA Claim*

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." § 12112(a). To state a prima facie case of

discrimination under Title I, "a plaintiff must demonstrate that: 1) he or she suffers from a disability within the meaning of the ADA; 2) that he or she was otherwise qualified to perform his or her job or a job he or she was applying for; and 3) that he or she was not hired for the job or was discharged because of a disability." E.E.O.C. v. J.B. Hunt Transp., Inc., 128 F. Supp. 2d 117, 124 (N.D.N.Y. 2001) (citing Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383 (2d Cir. 1996)).

Even assuming that Plaintiff suffers from an ADA-qualified disability and was otherwise capable of performing the duties associated with her position, the discussion above shows that the Complaint fails to plausibly allege that she was either formally or constructively terminated from her position because of that disability. The Court has already determined that the events that occurred on May 20, 2016 did not result in Plaintiff's termination, given that she was later reinstated and that all her benefits were subsequently reactivated, seemingly resulting in no loss of pay or any other material detriment. Further, Plaintiff's June 1, 2016 resignation did not constitute a constructive termination because the circumstances of her employment were not "so difficult or unpleasant that a reasonable person in [Plaintiff's] shoes would have felt compelled to resign.'" Whidbee, 223 F.3d at 73.

Plaintiff's ADA claim will therefore be dismissed without prejudice.

### 2. The State Law Defamation Claim

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." Hogan v. Herald Co., 446 N.Y.S.2d 836, 839 (N.Y. App. Div. 1982). Because Plaintiff's defamation claim is directed at an oral statement—namely, McCormick's April 2014 announcement that Plaintiff would no longer be supervising any of

Defendant's community-based programs—it is a claim for slander. <u>Albert v. Loksen</u>, 239 F.3d 256, 265 (2d Cir. 2001) ("Generally, spoken defamatory words are slander; written defamatory words are libel."). "The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." <u>Id.</u> at 265–66 (citing <u>Dillon v. City of New York</u>, 704 N.Y.S.2d 1, 5 (N.Y. App. Div. 1999)) (internal footnotes omitted).

The Court finds that Plaintiff's allegations are plainly insufficient to satisfy the defamation standards under New York law. McCormick's statement about Plaintiff's new role was not false. Its truth alone is fatal to Plaintiff's defamation claim. Nor does the Complaint plead that the statement resulted in any special harm to Plaintiff's reputation in the form of pecuniary damages or out-of-pocket losses. <u>See</u> <u>Matherson v. Marchello</u>, 473 N.Y.S.2d 996, 998 (N.Y. App. Div. 1984) ("Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation, not from the effects of defamation." (internal quotation marks and citations omitted)).

As a result, Plaintiff's state law defamation claim will be dismissed without prejudice.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendant's Motion (Dkt. No. 21) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED**, that Plaintiff's wage discrimination Title VII claim is **DISMISSED with prejudice**; and it is further

**ORDERED**, that Plaintiff's hostile work environment Title VII claim, wrongful termination Title VII claim, ADA claim, and state law defamation claim are **DISMISSED without prejudice**; and it is further

**ORDERED**, that Plaintiff's Title VII claim for employment discrimination survives Defendant's Motion; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the local rules.

**IT IS SO ORDERED.**


DATED:     November 14, 2018
           Albany, New York


Lawrence E. Kahn
U.S. District Judge